IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Rosa Gonzales, | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 6:16-506-MGL-KFM |
| vs. | ) ) ) | **REPORT OF MAGISTRATE JUDGE** |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") benefits on July 11, 2012, alleging disability since September 1, 1997. The application was denied initially and on reconsideration by the Social Security Administration. On June 11, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff, her attorney, and Karl S. Weldon, an impartial vocational expert, appeared on August 12, 2014, considered the case *de novo*, and on November 24, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The

---

[1]A report and recommendation is being filed in this case in which one or both parties declined to consent to disposition by the magistrate judge.

ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on December 21, 2015. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)     The claimant has not engaged in substantial gainful activity since July 11, 2012, the application date (20 C.F.R. § 416.971 *et. seq.*).

(2)     The claimant has the following severe impairments: anxiety disorder, affective disorder, schizophrenia (residual type), and peptic ulcer (20 C.F.R. § 416.920(c)).

(3)     The claimant does not have an impairment or combination of impairments that meets or medically equals the the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).

(4)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) except she should have less-than-occasional, if any, exposure to hazards associated with unprotected dangerous machinery or unprotected heights. She is able to understand, remember, and carry out simple, routine, repetitive tasks in a low-stress work environment that is free of fast-paced or team-dependant production requirements, with clearly defined performance expectations, and occasional, if any, job changes. Her work must be performed with less-than-occasional interaction with the general public and only occasional interaction with coworkers.

(5)     The claimant has no past relevant work (20 C.F.R. § 416.965).

(6)     The claimant was born on September 18, 1991, and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. 416.963).

(7)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 416.964)

2

(8)    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. § 416.968(a)).

(9)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs in the national economy that the claimant can perform (20 C.F.R. § 416.969 and 416.969(a)).

(10)    The claimant has not been under a disability, as defined in the Social Security Act, since July 11, 2012, the date the application was filed (20 C.F.R. § 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that

prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

preponderance.  If there is evidence to justify a refusal to direct
a  verdict were the case before a jury, then there is "substantial
evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to
assure that there is a sound foundation for the Commissioner's findings and that the
conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there
is substantial evidence to support the decision of the Commissioner, that decision must be
affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

On February 15, 2005, the plaintiff had an initial clinical assessment at
Spartanburg Area Mental Health Clinic ("SAMHC").  She was noted to have some social
anxiety that was affecting her self-esteem and had caused a significant decline in her
school grades.  The plaintiff had been adopted by her grandparents.  She was noted to
have no relationship with her biological father and had never "bonded" with her mother.
Following a mental status examination, the plaintiff was diagnosed with generalized social
anxiety disorder and a Global Assessment of Functioning ("GAF") score of 50 (Tr. 255-60).

On April 27, 2005, Ann Marie Menendez-Caldwell, M.D., of SAMHC, initially
evaluated the plaintiff.  The plaintiff's grandmother was also present and was noted to have
custody of the plaintiff since birth.[2]  The plaintiff reported worrying excessively "about
everything."  She indicated that she gets palpitations and feels sick to her stomach when
she gets nervous.  Dr. Menendez-Caldwell indicated that the plaintiff endorsed decreased
energy, feeling sad, and being a little angry.  The plaintiff's affect appeared to be shy with
some dysphoria.  Dr. Menendez-Caldwell diagnosed social anxiety disorder; generalized
anxiety disorder and depressive disorder, not otherwise specified ("NOS"); school problems;

---

[2]Throughout the treatment records it is often noted that the plaintiff is accompanied by
her "mother," which refers to her grandmother (doc. 12 at 5 n.2).

5

and a GAF score of 50.  Dr. Menendez-Caldwell prescribed Lexapro and recommended school-based therapy (Tr. 335-36).  Dr. Menendez-Caldwell also treated the plaintiff and adjusted her medications on May 18, 2005 (Tr. 334), June 29, 2005 (Tr. 333), and August 10, 2005 (Tr. 331-32).

On May 13, 2005, Camille Bramhall, MA, of SAMHC, indicated that the plaintiff was hesitant in therapy and difficult to engage (Tr. 254).  On August 1, 2005, Ms. Bramhall indicated that the plaintiff and her grandmother reported progress with being more talkative, less irritable, and having more energy.  The plaintiff had a much brighter affect, but she had continued anxiousness about starting school (Tr. 254).

On October 13, 2005, Lori Barwick, M.D., of SAMHC, noted that the plaintiff's grandmother reported that the plaintiff was unmotivated, had a lack of energy, isolated herself frequently, and had difficulty getting along with peers.  Dr. Barwick noted social problems and grade problems.  The plaintiff and her grandmother reported episodes of sleepwalking and hypnopompic or hypnogogic hallucinations at night. Dr. Barwick indicated that the plaintiff had a flat affect and a quiet tone but did warm up as the interview continued.  Dr. Barwick recommended continued therapy and increased the plaintiff's dose of Celexa (Tr. 329-30).

On October 31, 2005, Ms. Bramhall indicated that the plaintiff denied significant problems with anxiety but was struggling with social issues.  The plaintiff was disheveled and was noted to have become more defiant and more irritable.  The plaintiff had difficulty staying on task in therapy sessions.  Continued therapy services at school were recommended (Tr. 252).

On December 28, 2006, Dr. Barwick noted that the plaintiff's grandmother was frustrated over the plaintiff's lack of motivation and lack of energy.  Dr. Barwick indicated that the plaintiff was quiet and had a flat affect. Dr. Barwick noted the plaintiff's difficulty tolerating medications.  She started the plaintiff on a trial of Prozac (Tr. 328). On January

6

26, 2006, Dr. Barwick evaluated the plaintiff in the presence of her grandmother, who reported that the plaintiff's motivation seemed better, and Ms. Bramhall noted that the plaintiff had progressed in therapy but continued to have social anxiety. Dr. Barwick increased the plaintiff's dose of Prozac (Tr. 327).

On January 30, 2006, Ms. Bramhall noted that the plaintiff had become more outgoing verbally, but was having problems with her grades due to her depressive symptoms and anxiety (Tr. 252).

On April 13, 2006, Dr. Barwick noted that the plaintiff's grandmother reported that Prozac wasn't helping any more and noted that the plaintiff seemed very lethargic and difficult to engage. Dr. Barwick started the plaintiff on a trial of Effexor (Tr. 326).

On May 1, 2006, Ms. Bramhall indicated that the plaintiff still had a bright affect and mood. She had relationship issues with her grandmother and was "sluggish."

On June 14, 2006, Dr. Barwick noted that the plaintiff and her grandmother reported no significant difference with Effexor. Dr. Barwick indicated that the plaintiff was quiet but responsive with no reported psychosis. Dr. Barwick increased the plaintiff's Effexor dose (Tr. 325). On August 16, 2006, Dr. Barwick noted that the plaintiff couldn't tolerate the increased dose of Effexor. The plaintiff reported she was anxious about starting school. Dr. Barwick switched the plaintiff back to Celexa (Tr. 324). On October 11, 2006, the plaintiff denied problems at school, but her grandmother reported continued frustration over the plaintiff's motivation. Dr. Barwick joined in the grandmother's concerns about her lack of socialization. Dr. Barwick indicated that the plaintiff might have a personality disorder. Dr. Barwick continued the plaintiff on Celexa and advised continued therapy (Tr. 323).

On October 25, 2006, Susan Henderson, MA, of SAMHC, indicated that the plaintiff was anxious about beginning school but was only having major anxiety one to two times per week. Ms. Henderson recommended continued therapy (Tr. 251).

On November 30, 2006, Dr. Barwick noted reports of improvement and suggested testing to determine what part of the plaintiff's symptoms involved personality disorders verses anxiety and depression. Dr. Barwick diagnosed social anxiety disorder with some depression, NOS, rule out some underlying schizoid or avoidant personality. She continued the plaintiff on Celexa, advised continued therapy, and ordered testing with Dr. Burns (Tr. 322).

On January 12, 2007, Ms. Henderson indicated that the plaintiff had been compliant at home and that her anxiety was decreased because of Christmas break (Tr. 251). On May 15, 2007, Ms. Henderson noted continued but diminished anxiety at school (Tr. 249). On August 10, 2007, Ms. Henderson indicated that the plaintiff had displayed extreme anxiety before starting camp. Ms. Henderson indicated that the plaintiff still needed to work on self-confidence (Tr. 249).

On September 26, 2007, Dr. Barwick noted multiple medication trials. Dr. Barwick noted that the plaintiff had tried to do a summer camp program with Susan Henderson, which resulted in a "full-blown panic attack, completely overwhelmed, hyperventilating." The plaintiff reported continuing anxiety and nervousness, especially around crowds, but reported that she was doing fairly well with her schoolwork. Dr. Barwick indicated that the plaintiff reported pretty significant panic attacks, with increased heart rate, sweatiness, clamminess, and hyperventilation. Dr. Barwick noted that the plaintiff's symptoms might result from an avoidant personality. Dr. Barwick indicated that the plaintiff's affect was somewhat blunted. Dr. Barwick started the plaintiff on a trial of Cymbalta (Tr. 321). On October 10, 2007, the plaintiff reported no dramatic difference with starting Cymbalta (Tr. 320).

On November 16, 2007, Ms. Henderson indicated that the plaintiff had been anxious about beginning school but was now only having anxiety three times a week at

school.  Therapy focused on helping the plaintiff assert herself more and conversing with peers (Tr. 250).

On December 6, 2007, Dr. Barwick reported that Cymbalta was making the plaintiff feel too sedated at times.  The plaintiff's grandmother reported concern over additional medication changes but agreed to a trial of Paxil (Tr. 319).  On December 21, 2007, the plaintiff reported benefit from her medication and indicated that she had done better in school.  Dr. Barwick continued Paxil (Tr. 318).

On February 17, 2008, Ms. Henderson indicated that the plaintiff's anxiety seemed to be under better control.  The plaintiff reported more confidence.  She had better hygiene and had increased eye contact (Tr. 250).  On May 2, 2008, Ms. Henderson indicated that medication improved the plaintiff's motivation and reduced her anxiety.  Ms. Henderson indicated the plaintiff had improved her school performance but struggled with year-end testing (Tr. 247).

On June 30, 2008, Dr. Barwick noted that the plaintiff said her medications were helping, but the plaintiff's grandmother reported no change and indicated that the plaintiff was unmotivated at home and seemed to be in slow motion (Tr. 316).  On July 11, 2008, testing showed more anxiety problems than personality problems.  Dr. Barwick and the plaintiff's grandmother were concerned about the plaintiff's problems with socialization. The plaintiff's medications helped her feel less anxious but caused weight gain.  Dr. Barwick continued Paxil (Tr. 315).

On August 5, 2008, Ms. Henderson noted that the plaintiff was scheduled to participate in a summer camp to assist with socialization.  Continued therapy services were advised (Tr. 247).

On August 15, 2008, Dr. Barwick reported stable mood but medication-caused weight gain was outweighing its benefit.  The plaintiff indicated she recently had more depression than anxiety.  Dr. Barwick started the plaintiff on a Zoloft, (Tr. 314), which, as

of September 25, 2008, she had tolerated fairly well.  As of that date she was feeling less anxious and depressed (Tr. 313).

On November 10, 2008, Ms. Henderson indicated that the plaintiff continued to struggle with self-confidence.  The plaintiff had responded well to medication (Tr. 248).

On November 19, 2008, Dr. Barwick reported some decline in her anxiety and better social functioning.  The plaintiff's affect was bright, but she continued to gain weight (Tr. 312).

On January 20, 2009, Ms. Henderson indicated that medication had improved the plaintiff's anxiety but had caused weight gain, which could impair her self-confidence (Tr. 248).

On January 29, 2009, Dr. Barwick noted that the plaintiff's grades had been "terrible."  The plaintiff's grandmother noted improvement in mood and socialization.  The plaintiff was alert, cooperative, and responsive, with a brighter affect.  Dr. Barwick continued Zoloft (Tr. 242).  On July 22, 2009, the plaintiff's grandmother reported a family history of bipolar and schizophrenia.  Dr. Barwick found the plaintiff's affect was little bit blunted, but she found no psychosis.  Dr. Barwick continued the plaintiff's current treatment regimen (Tr. 241).

On November 9, 2009, Ms. Henderson indicated that the plaintiff had been exercising to lose weight, which had helped with self-confidence (Tr. 246).  On January 27, 2010, Ms. Henderson noted continued progress, and she recommended continued therapy (Tr. 246).

On February 12, 2010, the plaintiff began vocational rehabilitation in an effort to transition from school to work.  She was diagnosed with social anxiety disorder and depressive disorder NOS.  She got a job at McDonalds, but she had to quit after one day because of anxiety (Tr. 373-88).

10

On March 5, 2010, Dr. Barwick noted that the plaintiff had anemia that required an infusion. The plaintiff was alert and cooperative, but quiet with depression, low energy, a blunted affect, and low motivation. Zoloft was no longer helpful. Dr. Barwick increased the plaintiff's Cymbalta (Tr. 311). On June 4, 2010, the plaintiff reported being more depressed and fatigued. The plaintiff's grandmother indicated poor motivation, ineffective medication, and medication-induced weight gain. Dr. Barwick noted problems tolerating or affording various medications and started the plaintiff on a trial of Pristiq (Tr. 310). On August 9, 2010, the plaintiff's grandmother said that the Pristiq did not improve the plaintiff's condition. The plaintiff still had little energy and a lot of anxiety at times. The plaintiff's grandmother reported that the plaintiff did not want to do anything besides sit and watch cartoons. Dr. Barwick stated, "I strongly support her therapeutic need." She started the plaintiff on a trial of Lamictal (Tr. 309).

On May 23, 2011, Frank E. Forsthoefel, M.D., of SAMHC, initially evaluated for depression and social anxiety. The plaintiff reported sleeping too much, being withdrawn, having loss of appetite, loss of weight, lack of energy, and lack of interest. Dr. Forsthoefel found a despondent affect and diagnosed depressive disorder NOS and a GAF of 45 (Tr. 307-308).

On June 27, 2011, a nurse practitioner at SAMHC evaluated the plaintiff and reviewed her medications. The plaintiff was noted to have tried working at McDonalds but had been unable to handle it because the staff was rushing her, which caused her to panic. The plaintiff complained that Cymbalta had not helped and only made her gain weight (Tr. 305-306). On September 7, 2011, the plaintiff reported that Klonopin was helping with her depression, but that Cymbalta was not. She reported that she had enough energy to get up and use her computer, but not enough energy to do anything else. She complained of being tired and fatigued. The plaintiff's grandmother reported that the plaintiff never did anything on her own and needed to be directed all day long. She was concerned that

11

something else might be wrong with the plaintiff, noting a family history of mild retardation and paranoid schizophrenia. She reported that the plaintiff was not interested in doing anything normal for her age. The nurse practitioner indicated that the plaintiff's medications were "partially" working and that she would ask Dr. Forsthoefel for suggestions (Tr. 303-304).

On October 10, 2011, Dr. Forsthoefel evaluated the plaintiff. He noted that her depression was essentially no better, although the plaintiff had happy moments with improved energy. Dr. Forsthoefel found psychomotor retardation, a sad mood, and a blunted affect. He increased the plaintiff's Cymbalta and started a trial of Seroquel. He assessed her GAF score at 45 and stated she "remains withdrawn with no energy, interest, and unable to perform activities of daily activities . . . I believe that she qualifies for disability" (Tr. 270-71).

On December 1, 2011, the plaintiff had a vocational assessment through vocational rehabilitation. The plaintiff reported anxiety and depression that affected her ability to work and caused issues with memory and focus. The plaintiff's social anxiety disorder and tendency towards distraction resulted in an inability to perform work in large groups of people and an inability to work in noisy areas. Her depressive disorder NOS caused difficulty with decision-making and frequent change. Therefore, she could not handle jobs requiring her to be the sole decision-maker, nor could she handle jobs requiring change in tasks. The plaintiff reported enjoying her work evaluation. It was noted that she would benefit from services involving supported employment (Tr. 366-72).

On December 9, 2011, Dr. Forsthoefel found continued depression, lack of interest, lack of energy, blunted affect, self-neglect, and benign voices. He noted the plaintiff was a little more interactive in socialization with her family best friend. He diagnosed depressive disorder NOS, found a GAF score of 45, and continued the plaintiff's medications (Tr. 268-69).

On February 6, 2012, Ebony Brown, of SAMHC, noted that, as side effects of her medications, the plaintiff had weight gain, fatigue, increased thirst, and constant hunger. She had a flat affect, and she spoke very softly. The plaintiff reported obtaining a job at McDonalds through vocational rehabilitation, but she explained that she could not keep the pace needed for that job, nor meet its expectations. The plaintiff's grandmother reported behaviors including withdrawal and lack of motivation. Medications were continued (Tr. 266-67).

On April 9, 2012, the plaintiff reported that her depression was no longer disabling and that she had increased energy and interest. She continued to have hallucinations but was hearing a decreased amount of voices. Dr. Forsthoefel indicated that her affect was despondent. He diagnosed depressive disorder NOS and a GAF score of 50. Dr. Forsthoefel refilled her Cymbalta, Klonopin, and Seroquel (Tr. 264-65).

The plaintiff started vocational rehabilitation, including a work attempt. Two weeks later, on June 5, 2012, problems of increasing isolation, depression, and anxiety caused her to be seen off schedule by Catherine J. Kreiser, M.D., of SAMHC, to determine whether she could continue her work attempt. The plaintiff admitted to hearing voices inside her head. The plaintiff's grandmother reported that the plaintiff was very childlike and had to be told what to do and only liked watching cartoons. Dr. Kreiser found mild retardation of the plaintiff's psychomotor activity. Dr. Kreiser diagnosed depressive disorder NOS; rule-out major depressive disorder with psychotic features vs. schizoaffective disorder; and gave her a GAF score of 60. Dr. Kreiser switched the plaintiff from Cymbalta to Wellbutrin and encouraged her to continue participating in vocational rehabilitation (Tr. 262-63).

On July 27, 2012, Dr. Forsthoefel evaluated the plaintiff. She admitted that she continued to hear voices but only at a distance. He noted that the plaintiff did talk to herself and remained withdrawn. The plaintiff admitted that she sometimes felt worthless.

13

Dr. Forsthoefel indicated that the plaintiff, "Remains with an axis 2 dependency, immaturity for years.  Remains disabled from all work."  Dr. Forsthoefel's diagnoses included schizophrenia, residual type, and a GAF score of 45 (Tr. 285-86). On October 1, 2012, Dr. Forsthoefel indicated that the plaintiff had a partial response to her depression and vocal hallucinations with the combination of Wellbutrin and Invega. He noted that the plaintiff looked a little brighter.  He gave her a GAF of 50 and stated that, "[d]espite marginal improvement [she] remains totally disabled from all work."  He increased her dose of Wellbutrin (Tr. 283-84).

On October 2, 2012, Caleb Loring, IV, Psy.D., performed a psychological assessment of the plaintiff at the Commissioner's request.  The plaintiff reported applying for disability due to severe depression and anxiety.  The plaintiff indicated that she had anhedonia, that she had no joy in her life, and that she had no desire to do anything.  She felt that people were always talking about her.  The plaintiff indicated that she just wanted to be alone and do nothing.  She indicated that she used to have panic attacks a lot in school, but now only had one every once in a while and was mostly depressed.  Dr. Loring found the plaintiff to be pleasant and cooperative.  The plaintiff appeared to put forth good effort on all tasks and did not appear to promote symptoms. Dr. Loring indicated that the assessment was considered to be a valid estimate of the plaintiff's current psychological and intellectual functioning.  Dr. Loring noted the plaintiff's histories.  He found the plaintiff to be appropriately groomed and to have appropriate eye contact.   The plaintiff was pleasant and cooperative.   She described her mood as "blah" and reported feeling emotionless all the time.  Dr. Loring found the plaintiff to seem moderately depressed and found her affect was dysphoric.  The plaintiff admitted to hearing voices but did not know what they were saying.  The plaintiff's grandmother reported that she would hear the plaintiff laughing at times at things that were not there. Dr. Loring indicated that the plaintiff was alert and oriented and did not evidence any concentration problems.  The plaintiff was

14

able to quickly complete the serial three's task presented to her and was able to recall three out of three unrelated words after a brief delay.  Dr. Loring estimated the plaintiff's insight and judgment to be fair.  The plaintiff denied suicidal ideation, but reported feeling worthless.  Dr. Loring administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"), which showed a low average range of intelligence.  The plaintiff reported that she had her driver's permit and could drive but had no desire to get her regular license because she did not like to go out.  The plaintiff reported that she could do indoor and outdoor chores, but her grandmother reported that the plaintiff does not do chores and was withdrawn and showed no interest with helping out at all.  The plaintiff reported she could shop, but could not manage money.  She reported that she could not prepare simple meals, but could take care of her own personal hygiene.  Dr. Loring noted that the plaintiff attended vocational rehabilitation to work Monday through Friday between 8:30 and 3:30 p.m.  The plaintiff's grandmother reported that when the plaintiff got home she watched immature TV shows like cartoons.  The plaintiff's grandmother reported that the plaintiff did not act her age.  Dr. Loring indicated that the plaintiff presented as capable of engaging in a variety of activities of daily living.  He indicated that she did appear to have symptoms of depression but was "capable of going to work at the vocational rehabilitation and appears to be generally fairly functional."  Dr. Loring noted that the plaintiff's mental status was intact and seemed as though intellectually she was probably functioning in the low average range.  Dr. Loring stated, "It appears that she is currently receiving treatment and hopefully she will probably improve with some time."  He explained that it was difficult to distinguish to what extent the plaintiff was experiencing psychotic symptoms and that they did not appear to be particularly debilitating to her "at the time of this assessment."  Dr. Loring indicated that the plaintiff evidenced no significant concentration or memory problems.  He noted the plaintiff's issues with panic attacks in the past and stated, "Therefore should she become employed in the future, it would be best for her to work at a job with limited public contact.  She

15

presents as somebody who is capable of learning simple vocational tasks and most likely completing them at an adequate pace with persistence." He also indicated that if the plaintiff was awarded funds, she would probably be capable of managing them in her own best interest. Dr. Loring's diagnoses were major depressive disorder, recurrent, moderate; psychotic disorder, NOS, rule out; anxiety disorder NOS; personality disorder, NOS; and a GAF score of 55 (Tr. 273-76).

A Psychiatric Review Technique Questionnaire form was completed by Olin Hamrick, Jr., Ph.D., a non-examining consultant on contract to the Administration, on October 22, 2012. Dr. Hamrick diagnosed the plaintiff with affective disorders and anxiety related disorders and opined that the plaintiff had mild limitations in her activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. The plaintiff had not experienced any repeated episodes of extended decompensation. Dr. Hamrick summarized the plaintiff's medical record and determined that she "retained the mental capacity to perform simple, unskilled work with no more than moderate limitations of work-related function due to her mental conditions." Dr. Hamrick gave great weight to the findings of Dr. Loring (Tr. 74-79).

Dr. Hamrick also completed a Mental Residual Functional Capacity ("RFC") Assessment opining that the plaintiff was not significantly limited in her ability to remember locations and work-like procedures and to remember and carry out very short and simple instructions. The plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions. She was not significantly limited in her ability to perform activities within a schedule, maintain attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination or proximity to others without being distracted by them, and to make simple work-related decisions. The plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, to complete a normal workday without psychologically based

16

interruptions, and to perform at a consistent pace (Tr. 77-78). The plaintiff was also moderately limited in her ability to interact appropriately with the general public, respond to supervisors, get along with coworkers and peers without distraction, maintain socially appropriate behavior, respond appropriately to changes in work setting, and set realistic goals or make plans independently of others. She was not significantly limited in her ability to ask simple questions and request assistance, be aware of normal hazards, use public transportation, and travel to unfamiliar locations (Tr. 78). Dr. Hamrick concluded that the plaintiff's mental symptoms and impairments were severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require ongoing interaction with the public (Tr. 79).

On November 3, 2012, John Burrell, M.D., performed a consultative examination of the plaintiff at the Commissioner's request. Dr. Burrell noted that the plaintiff's two primary problems were depression and auditory hallucinations. The plaintiff indicated that she was unable to understand what the voices were saying, and she denied getting any command hallucinations. The plaintiff's grandmother reported that the plaintiff was very withdrawn even when she was still in school and that the plaintiff's grades suffered because of that. Dr. Burrell noted a significant family history of schizophrenia with multiple siblings with obvious schizophrenia or bipolar, often times with psychotic features. The plaintiff reported no significant problems with exertional activities. Dr. Burrell indicated that the plaintiff's current medications included Wellbutrin, Seroquel, Invega, and clonazepam. The plaintiff was 5'4" and weighed 196 pounds. She was appropriately oriented and had an essentially unremarkable physical examination. Dr. Burrell indicated that he did not see any evidence of response to auditory hallucinations at that time. He indicated that the plaintiff had a slightly flattened affect. Dr. Burrell diagnosed auditory hallucinations. He indicated that this seemed to suggest a diagnosis of schizophrenia, and he would "highly recommend the patient to do psychiatric evaluation through the disability office with

17

someone who is more qualified to give her a complete diagnosis and make recommendations regarding her likely outcome." Dr. Burrell stated, "In the meantime, she does appear stable on her current medications and it seemed her main problem with gainful employment is due to her negative symptoms, which I suspect her depression is a symptom as opposed to major depressive disorder, although again a psychiatric referral would be best in this instance" (Tr. 277-79).

On December 28, 2012, Dr. Forsthoefel evaluated the plaintiff for continued disabling depression and hearing voices. It was reported that the plaintiff was not functioning. She continued to be withdrawn, talked to herself a lot, and was very forgetful. Dr. Forsthoefel indicated that the plaintiff presented as withdrawn and with a flat affect. The plaintiff was assessed with a GAF score of 45. He added Latuda to the plaintiff's medications (Tr. 281-82).

On March 5, 2013, the plaintiff participated in group therapy. She was very active in discussions and had made great progress (Tr. 301). On March 19, 2013, the plaintiff's therapist noted that the plaintiff was talking more and interacting with the group on a greater level (Tr. 300).

On March 20, 2013, Dr. Forsthoefel evaluated the plaintiff. He indicated that her depression and hearing voices remained disabling with only marginal improvement. He indicated that the plaintiff remained dysfunctional in her activities of daily living. Dr. Forsthoefel noted that the plaintiff remained withdrawn from her family. He noted that she had been unable to pick up her prescription for Latuda until that day. Dr. Forsthoefel found the plaintiff's mood and affect to be flat. He assessed her with a GAF score of 45. Dr. Forsthoefel increased the plaintiff's dose of Celexa and recommended that she start Latuda. He stated that the plaintiff "remains disabled from all work" (Tr. 298-99).

On March 26, 2013, the plaintiff participated in group therapy. She was noted to be doing well and continued to open up more and more in therapy. The plaintiff's

therapist indicated that group seemed to be a place where the plaintiff could "interact in a safe measured way and it gives her a chance to practice interacting with her peers" (Tr. 297).

On April 8, 2013, Ron Rousseau, LMSW, MPH, provided a statement regarding the plaintiff. Mr. Rousseau indicated that the plaintiff had been best friends with his daughter for several years. Mr. Rousseau explained that his daughter was diagnosed with schizophrenia at the age of 15 and had a hard time keeping friends. He indicated that due to his daughter's similarities with the plaintiff, they were able to remain friends. Mr. Rousseau indicated that even though he did not work directly in behavioral health he felt he had enough exposure professionally as well as personally to speak regarding the plaintiff's condition. He stated, "While I cannot clinically diagnose Rosa I believe she has very similar symptoms of my daughter." Mr. Rousseau indicated that in his presence the plaintiff had displayed symptoms such as: difficulty using and understanding language; difficulty relating to people, objects, and events; for example, lack of eye contact, pointing behavior, and lack of facial responses; unusual play with toys and other objects; and difficulty with changes in routine or familiar surroundings. He also indicated that the plaintiff's anxiety had prevented her from visiting on several occasions even though they always tried to make her feel welcome. Mr. Rousseau stated that his daughter reported to him that the plaintiff heard the same type of voices in her head that his daughter dealt with on a daily basis. Mr. Rousseau stated, "I realize that medical evidence is required to deem someone disabled. However I do not know if there is enough medical evidence available for disability determination to make that decision due to lack of MD visits from not having medical coverage." He further explained that he was hopeful his letter would help the plaintiff in being properly found disabled and able to receive the benefits she deserved. He explained, "Working in a hospital setting I have seen several questionable 'disabled' individuals however I truly believe that Rosa is a deserving individual" (Tr. 287).

19

On April 9, 2013, the plaintiff participated in group therapy.  The plaintiff's therapist indicated that she had "grown from a silent participant to a leader within the group" (Tr. 296).  On April 16, 2013, her therapist indicated that the plaintiff talked on a regular basis and was a "very healthy member of our group" (Tr. 295).

On April 17, 2013, Dr. Forsthoefel provided a statement regarding the plaintiff (Tr. 288).  He indicated that he had been the plaintiff's psychiatrist for several months and that she had been diagnosed with residual schizophrenia and depression. Dr. Forsthoefel indicated that the plaintiff had suffered from severe mental health problems since she was a child, which tended to indicate that her condition would be chronic.  He explained that he was hopeful that once the plaintiff was able to start taking the appropriate medications her condition would improve somewhat.  He stated, "Right now it is difficult for her to get her medications filled because of her financial limitations." Dr. Forsthoefel indicated that when he interviewed the plaintiff, it was clear that she was "not a functioning person, and I have expressed this in my office notes."  He indicated that the plaintiff's concentration and memory were impaired and that she was easily distracted and seemed to be responding to internal stimuli.  Dr. Forsthoefel indicated that the plaintiff did not connect during interview and remained withdrawn from family. He noted the plaintiff's family reported a history of poor eye contact, which he also observed himself.  Dr. Forsthoefel stated, "For this reason I suspect she might be autistic to some degree."  He explained that based on his experience with the plaintiff and her history she would not be able to work at any type of job. He stated, "She would not be able to interact with supervisors and coworkers appropriately because she is so withdrawn.  She would not be able to follow even simple instructions due to her high level of distraction and lack of concentration."  Dr. Forsthoefel indicated that based on the plaintiff's "history of having severe mental health issues into childhood, he did not expect her condition to improve to the point where she would not have these limitations" (Tr. 288).

20

On April 18, 2013,  a Psychiatric Review Technique Questionnaire form and Mental RFC Assessment were completed by Craig Horn, M.D., a non-examining consultant on contract to the Administration.  Dr. Horn agreed with the findings of Dr. Hamrick and gave great weight to the findings of Dr. Loring (Tr. 90).  He concluded that the plaintiff retained the mental capacity to perform simple, unskilled work with no more than moderate limitations or work-related functions due to her mental conditions (Tr. 90).  Like Dr. Hamrick, Dr. Horn also concluded that the plaintiff's mental symptoms and impairments were severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require ongoing interaction with the public (Tr. 87-93).

On April 23, 2013, the plaintiff participated in group therapy.  She was noted to have done "really well" and was "open in group" (Tr. 294).  On April 30, 2013, the plaintiff's therapist indicated that her "openness and increase in social responsiveness is amazing."  However, the therapist also noted that the plaintiff "still has a long ways to go but group is clearly helping" (Tr. 293).  On May 7, 2013, the plaintiff was noted to have been open and shared with the group on a regular basis (Tr. 292). On May 14, 2013, the plaintiff was noted to have had made great progress and seemed to be coming out of her shell.  However, the therapist noted that she needed continued group therapy to help her continue to develop skills and that the plaintiff would "need to be on medication for her lifetime" (Tr. 291).  On May 21, 2013, the plaintiff was noted to have continued to open up and make good progress (Tr. 290).  On May 28, 2013, the therapist indicated that the plaintiff had made great progress but continued to struggle with anxiety (Tr. 289).  On June 10, 2013, the plaintiff reported that she was looking to move out of her house and to become more independent.  The plaintiff's therapist noted that the plaintiff had made the best progress out of any member of the group (Tr. 349). On June 25, 2013, the plaintiff spoke more often and laughed more openly than she had ever before.  The plaintiff's therapist indicated that the plaintiff's progress was amazing. (Tr. 348). On July 2, 2013, the plaintiff's therapist

indicated that the plaintiff was making excellent progress, but the therapist noted that the plaintiff still struggled with being emotionally honest (Tr. 347).

On July 3, 2013, Dr. Forsthoefel evaluated the plaintiff and noted that she had a partial response to her medications. He indicated that the plaintiff's mood was depressed and her affect was blunted. Dr. Forsthoefel assessed the plaintiff's GAF score at 50. He added a trial of Cymbalta to her medications (Tr. 345-46).

On August 13, 2013, the plaintiff participated in group therapy. The plaintiff was noted to be making steady progress, opening up in group, and finding her voice (Tr. 344). On August 20, 2013, the plaintiff was noted to be making progress. The plaintiff's therapist noted that the plaintiff would need the continued support of group as she worked towards being more independent (Tr. 343). On August 27, 2013, the plaintiff's therapist indicated that it was apparent that group therapy was helping the plaintiff break out of her shell. The plaintiff continued to make great improvement (Tr.342). On September 3, 2013, the plaintiff admitted to regularly worrying about her dog and her family. The plaintiff's therapist indicated that the plaintiff was making good progress but needed to be more assertive about getting her driver's license (Tr. 341). On September 10, 2013, the plaintiff was noted to be making good progress and regularly contributing to group (Tr. 340). On September 17, 2013, the plaintiff was working on driving more. Her therapist indicated that she was "just a little slow in setting up her driver's test due to anxiety." The plaintiff's therapist indicated that she was making "some" progress (Tr. 339). On September 24, 2013, the plaintiff was noted to be more active and vocal than when she started group (Tr. 338). On October 29, 2013, the plaintiff's therapist indicated that the plaintiff had been in a very quiet place over the past few weeks. The plaintiff was noted to be stable and to have lost a little bit of her progress in terms of being vocal. The plaintiff's therapist indicated that the change in the dynamic of the group due to new additions may have caused her to be quieter (Tr. 355).

On December 16, 2013, Ebony Letman, a nurse practitioner at SAMHC, evaluated the plaintiff for a medication check. The plaintiff reported benefit from her medications but questioned whether or not they could be causing her gastroesophageal reflux disease ("GERD"). Ms. Letman encouraged the plaintiff to follow up with her primary care physician. The plaintiff admitted to hearing voices one to two days a week and having continued anxiety. She maintained that although she could hear the voices she could not understand what they were saying. The plaintiff reported feeling "good" for one or two days and then getting really depressed again. She admitted to passing thoughts of suicide when she felt depressed. The plaintiff also admitted to paranoia in thinking that others were laughing at her. The plaintiff's medications were continued (Tr. 353-54).

On December 17, 2013, the plaintiff participated in group therapy. She continued to "grow" and was opening up more and more in therapy. However, the plaintiff's therapist noted that she still lived a rather isolated life free from any responsibility. The therapist stated, "She needs regular monitoring in the challenge of the group to help her grow emotionally" (Tr. 352). On January 7, 2014, the plaintiff was noted to be making good progress but was still somewhat isolated socially and depended on her family to take care of her basic needs. The plaintiff's therapist indicated that the plaintiff needed the regular help that the socialization and the group provide her with to interact with peers, which was important to her recovery process (Tr. 351). On January 21, 2014, the plaintiff continued to make great progress in terms of her increasing interactions with the group overall and working on stress management. However, she continued to be "pretty isolated and dependent on others to care for her survival." The plaintiff reported that she continued to work on learning to drive. The therapist indicated that being diagnosed with a mental illness so early in life had somewhat stunted the plaintiff's confidence and daring to try new things. The therapist indicated that she felt that the plaintiff was more capable socially than the plaintiff realized (Tr. 364). On February 4, 2014, the plaintiff had made significant progress

in opening up to her group.  She was talking more and seemed more confident.  The plaintiff's therapist indicated that it would not be long before the plaintiff was able to interact with the group and had made great progress.  However, the plaintiff's therapist indicated that the plaintiff still had a great deal of change to make in order to move out of isolation and deal with the anxiety that kept her stuck (Tr. 362).  On February 23, 2014, the plaintiff was noted to make significant changes.  She had faced her anxiety of driving and became more and more open in group.  The plaintiff's therapist indicated that the plaintiff was "fairly stable" and got a great deal from the social relation aspect of the group (Tr. 361).

On March 3, 2014, Dr. Forsthoefel evaluated the plaintiff and indicated that she was getting a partial response from her medications.  The plaintiff reported being depression free three days a week and hearing fewer voices.  Dr. Forsthoefel assessed the plaintiff with a GAF of 50, and he increased her dose of Cymbalta (Tr. 359-60).

On March 11, 2014, the plaintiff participated in group therapy.  She had made significant progress and was actively engaging in group.  The plaintiff was noted to have proven to be "very funny."  However, the plaintiff was still isolating and required her group as a place to have proper and healthy social interactions (Tr. 358).  On March 25, 2014, the plaintiff reported that she continued to work towards her goal of getting her license.  The plaintiff was talking more in group, and the more she talked it became clear that the plaintiff was often overwhelmed by anxiety and shuts down from some of her feelings (Tr. 357).  On April 1, 2014, the plaintiff was still making solid progress.  The plaintiff's therapist indicated that the plaintiff was mentally isolated at times and needed group to help her socialize more regularly (Tr. 356).  On May 6, 2014, the plaintiff had made good progress and made eye contact in group.  The plaintiff's therapist indicated that the plaintiff still needed help in controlling her emotions and learning how to express them properly (Tr. 397).

On May 12, 2014, Dr. Forsthoefel evaluated the plaintiff.  The plaintiff continued to hear disabling voices on a daily basis.  Dr. Forsthoefel indicated that the

24

plaintiff still remained isolated from society but was attending church with marginal interactions with people. He indicated that the plaintiff remained "stress intolerant and disabled from all work." Dr. Forsthoefel assessed a GAF score of 45 and increased her dose of Latuda (Tr. 395-96).

On May 20, 2014, the plaintiff participated in group therapy. The plaintiff reported that she was still afraid to go out or get things out of order in her life. The plaintiff's therapist indicated that the plaintiff was "at least considering getting out of her routine" (Tr. 394). On June 10, 2014, the plaintiff reported feeling better. She was noted to have made steady progress but needed to socialize more outside of her group. (Tr. 393). On June 17, 2014, the plaintiff reported making good progress with driving but was still really scared to go out of her routine. The plaintiff's therapist indicated that the plaintiff still needed group to encourage her to feel safer socially (Tr. 392). On June 24, 2014, the plaintiff admitted to audio hallucinations, which sounded more like internal background noise. Group discussion focused on learning to calm themselves and how to ignore the noise (Tr. 391). On July 29, 2014, the plaintiff was initially hesitant to participate actively in group, and she was reserved. The plaintiff was noted to have made continued progress with learning and practicing coping skills to reduce depression, anxiety, isolation, and reactions to stressors (Tr. 390).

In a function report dated July 31, 2012, the plaintiff reported that she lives with her family, and she experiences panic attacks when around a lot of people. She also claimed to experience auditory hallucinations (hearing voices when around others) (Tr. 173). She generally had no problems maintaining her own self-care, except she noted that she bathes every three days and never wants to keep her legs shaved (Tr. 174). She claimed to need reminders to bathe and sometimes to take medication. She was able to prepare simple meals for herself, and she was able to clean her own laundry (Tr. 175). She claimed not to do yard work because she lacked motivation and felt hopeless. She went

outside every day to go to vocational rehabilitation, and she had a driving permit, but she has no interest in driving.  She reported that she was able to handle money, including paying bills, counting change, and handling checking and savings accounts (Tr. 176).  She spent time with a friend regularly (Tr. 177).  She also claimed to experience memory and concentration problems, but stated that she could follow instructions "O.K." (Tr. 178).  She got along with authority figures well, but stated she could not handle stress, and her ability to handle change in routine depended on the change (Tr. 179).  She reported taking the following medications:    Celexa (depression); Klonopin (anxiety); Latuda (auditory hallucinations); Cymbalta (depression); and Seroquel (schizophrenia) (Tr. 197, 236).

At the administrative hearing in August 2014, the plaintiff testified that she attended a vocational rehabilitation center five days per week, 40 hours per week, for about one year.  The plaintiff stopped working through the vocational rehabilitation center in 2012 because she was told that she had "gained everything" she would there (Tr. 41).  While there, she would perform tasks such as stuffing envelopes for companies that contracted with the center (Tr. 42).  The plaintiff would be paid more if she stuffed more envelopes, but she did not have a quota (Tr. 43).  In 2012, she worked at McDonald's for approximately one day, a job she found through her vocational rehabilitation center (Tr. 40).  While she worked at McDonald's, she filled French fry containers and worked the drive-thru dealing directly with customers (Tr. 43).  She testified that she only lasted one day because she became overwhelmed with the rush of the work (Tr. 43-44).  The plaintiff testified that she has not looked for other kinds of employment (Tr. 44-45).

The plaintiff testified that she had one friend, but she spent most of her time alone watching television or listening to music (Tr. 45).  She spent about one hour each day using a computer (Tr. 46).  The plaintiff characterized her schizophrenic symptoms as auditory hallucinations of people's voices in the background about three to four times weekly and paranoia (Tr. 47-48).  The plaintiff has never attempted to harm herself.  She

26

claimed to experience periods of depression twice weekly for about 30 minutes at a time. She also claimed to have problems concentrating while at the vocational rehabilitation center (Tr. 49-50).

The plaintiff testified that spent time with her friend by going to the movies or going to the mall on occasion. She also participated in group therapy with her friend. She testified that the therapy helped her to the point that she discussed her problems rather than keeping them to herself (Tr. 52).

At the administrative hearing, the ALJ posed a hypothetical question to the vocational expert asking whether someone with the plaintiff's age, education, lack of past relevant work, and RFC, as set forth above, could perform work in the national economy (Tr. 60-62). The vocational expert testified that such a hypothetical person could perform jobs in the national economy, including as a cleaner, hand packager, and a machine operator (Tr. 62). Based on the vocational expert's testimony and the totality of the record evidence, the ALJ ruled that the plaintiff was capable of performing jobs in the national economy, and thus, was not disabled under the Social Security Regulations (Tr. 20-21).

## ANALYSIS

The plaintiff was 20 years old on the date of her application and 23 years old on the date of the ALJ's decision (Tr. 20-21). She completed high school, did not attend special education classes, and is able to speak, understand, read, and write in English (Tr. 158, 160). She has no past relevant work (Tr. 20).

The plaintiff argues that the ALJ erred by (1) failing to properly consider her GAF scores; (2) failing to properly assess her subjective complaints; and (3) failing to properly evaluate the opinion evidence from her treating psychiatrist (doc. 12 at 24-38).

### GAF Scores

The plaintiff first argues that the ALJ failed to properly consider her consistently low GAF scores. A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (4th ed. Text Revision 2000) ("*DSM-IV-TR*"). As noted by the plaintiff, her GAF score was assessed 13 times between May 2011 and May 2014 (doc. 12 at 24). She was assigned seven scores of 45, four scores of 50, one score of 55, and one score of 60 (Tr. 263, 268, 270, 276, 282, 283, 286, 299, 307, 346, 360, 364, 396).

A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See DSM-IV-TR*, 32-34. A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* Notably, the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*"). Despite the psychiatric community's reduced reliance on the GAF scale, the Social Security Administration issued Administrative Message 13066 ("AM 13066") directing that ALJs consider GAF scores within the following parameters:

> For purposes of the Social Security disability programs, when it comes from an acceptable medical source, a GAF rating is a medical opinion as defined in 20 C.F.R. § 416.927(a)(2). An adjudicator considers a GAF score with all of the relevant evidence in the case file and weighs a GAF rating as required by 20 C.F.R. § 416.927(c), and SSR 06-03p, while keeping the following in mind:
>
> The GAF is unlike most other opinion evidence we evaluate because it is a rating. However, as with other opinion evidence,

> a GAF needs supporting evidence to be given much weight. By itself, the GAF cannot be used to "raise" or "lower" someone's level of function. The GAF is only a snapshot opinion about the level of functioning. It is one opinion that we consider with all the evidence about a person's functioning. Unless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis.
>
> A GAF score is never dispositive of impairment severity.

*Emrich v. Colvin*, 90 F. Supp. 3d 480, 492 (M.D.N.C. 2015) (citing AM-13066). In *Johnson v. Colvin*, C.A. No. 6:14-3579-RBH, 2016 WL 462430, at *7 (D.S.C. Feb 8, 2016), the court "considered and rejected the plaintiff's argument that AM-13066 requires ALJs to analyze every GAF score of record as a medical opinion." *Gordon v. Colvin*, C.A. No. 1:15-3736-BHH-SVH, 2016 WL 4578342, at *19 (D.S.C. Aug 3, 2016) (finding harmless error where ALJ neglected to discuss all GAF scores but otherwise properly evaluated mental health record and would have reached same conclusion had the ALJ examined the GAF scores more closely), *R&R adopted by* 2016 WL 4555965 (D.S.C. Sept. 1, 2016).

Here, the ALJ specifically addressed four of the plaintiff's scores – two of 45, one of 50, and one of 55 (Tr. 14-15). However, as argued by the Commissioner, the ALJ thoroughly addressed the underlying medical records on which those scores were based and considered the plaintiff's complete mental health record (Tr. 14-15). For example, with respect to the plaintiff's score of 45 in October 2011, the ALJ noted it, but also observed the limited value of GAF scores in general (Tr. 14; *see* Tr. 270). The ALJ explained that the clinician's failure to explain the reason behind the GAF rating and the period to which it applied made it an unreliable indicator of the plaintiff's mental functioning for a disability analysis (Tr. 14). The ALJ went on to discuss the plaintiff's mental health records at length, including some of her other GAF scores, and discussed thoroughly the plaintiff's mental health examinations (Tr. 14-17). The ALJ also noted (Tr. 15-16) that Dr. Forsthoefel

indicated in March 2013 that the plaintiff had only shown "marginal improvement" (Tr. 298-99), while group therapy notes from the same time period indicated that the plaintiff continued to show significant improvement (Tr. 289-97, 338-64, 390-94).  Moreover, as noted by the Commissioner, the only score within the range of GAF scores that the ALJ omitted was the highest score of 60, indicating only moderate symptoms (Tr. 261), and, if anything, such an omission would be in the plaintiff's favor.

Although the ALJ did not cite every GAF score in his analysis, he thoroughly addressed all of the opinion evidence, which also relied on the plaintiff's medical records (Tr. 18-19).  The ALJ gave great weight to the opinion of consultative psychological examiner Dr. Loring, who found that the plaintiff could work with certain limitations, such as limited public contact (Tr. 19; *see* Tr. 273-76).  The ALJ noted that Dr. Loring rated the plaintiff with a GAF of 55, which indicated only moderate limitations and was generally consistent with the ALJ's findings (Tr. 55).  The ALJ also gave great weight to the two state agency psychologists, Drs. Hamrick and Horn, who both agreed that the plaintiff "retained the mental capacity to perform simple, unskilled work with no more than moderate limitations of work-related function due to her mental conditions" (Tr. 19; *see* Tr. 76, 93).  Importantly, as will be discussed in more detail below, the ALJ also properly weighed and gave specific reasons for giving the opinion of Dr. Forsthoefel, the plaintiff's treating psychiatrist, limited weight (Tr. 18-19).  The GAF ratings of 45 and 50 were all given by Dr. Forsthoefel (Tr. 268, 270, 282, 283, 286, 299, 307, 346, 360, 364, 396).

In light of the court's holding in *Johnson* and as it appears that the ALJ would have reached the same conclusion even if he had placed greater emphasis on the plaintiff's GAF scores, the undersigned recommends the court find the ALJ did not err in failing to analyze all of the plaintiff's GAF scores as part of the RFC assessment.

### Subjective Complaints

The plaintiff next argues that the ALJ erred in failing to properly consider her subjective complaints.  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (citations and internal quotation marks omitted) (emphasis in original).  In *Hines v. Barnhart*, a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d 559, 565 (4th Cir. 2006).  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id*. at 564 (quoting SSR 90-1p, 1990 WL 300812).  The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its

> severity, they need not be accepted to the extent they are
> inconsistent with the available evidence, including objective
> evidence of the underlying impairment, and the extent to which
> that impairment can reasonably be expected to cause the pain
> the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 16-3p[3], 2016 WL 1119029, at *5  ("[W]e will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on" in evaluating the claimant's subjective

---

[3]SSR 16-3p supersedes SSR 96-7p.  The ruling eliminates the use of the term "credibility" and clarifies that subjective symptom evaluation is not an examination of an individual's character.  2016 WL 1119029, at *1.  The effective date of SSR 16-3p is March 28, 2016. 2016 WL 1237954, at *1.  While the ALJ issued his decision prior to the effective date of SSR 16-3p, the two-step process and factors for evaluating a claimant's subjective symptoms remains substantially the same as that for assessing the credibility of a claimant's statements under SSR 96-7p.

symptoms. *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 16-3p states that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms. " 2016 WL 1119029, at *9. The factors to be considered by an ALJ in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include the following:

> (1) the individual's daily activities;
>
> (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> (3) factors that precipitate and aggravate the symptoms;
>
> (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at *7. *See* 20 C.F.R. § 416.929(c).

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 17). The plaintiff argues that the ALJ's reasons for this finding "were not substantially based and in some instances were inaccurate." Specifically, the plaintiff contends that the ALJ mischaracterized her "lack of motivation" to minimize the severity of

33

her complaints and placed too much emphasis on her positive participation in group therapy and activities of daily living (doc. 12 at 28-33). The undersigned finds no error in this regard.

The ALJ correctly found that treatment notes revealed complaints of social anxiety, but also that one of the plaintiff's main problems was a lack of motivation (Tr. 13; *see, e.g.*, Tr. 310-11, 315-16, 322-23). While the plaintiff cites to case law in which lack of motivation was a symptom of schizophrenia, the plaintiff cites to no such supporting medical records in this case (doc. 12 at 29-30). The ALJ noted that, although the plaintiff experienced psychiatric symptoms, the record as a whole indicated that the plaintiff's symptoms were under better control through group therapy treatment and medication. Despite these improvements, as noted by the ALJ, the plaintiff's "primary problems" continued to be "motivational issues" (Tr. 16). However, as the ALJ pointed out, despite her impairments, the plaintiff was able to attend full-time vocational training and engage in activities of daily living (Tr. 17-18).

Although the plaintiff admits that she did well in group therapy and "made great progress in terms of her increasing interactions with the group overall," she claims that the ALJ improperly used those findings as part of the credibility analysis (doc. 12 at 31). However, the ALJ specifically acknowledged that, despite the plaintiff's improvement, she was still somewhat socially isolated (Tr. 16). Further, the ALJ accounted for the plaintiff's functional limitations in this regard in the RFC finding by limiting her to "simple routine, repetitive tasks in a low-stress work environment that is free of fast-paced or team dependent production requirements, with clearly defined performance expectations, and occasional, if any, job changes" along with "less-than-occasional interaction with the general public, and only occasional interaction with coworkers" (Tr. 12). As argued by the Commissioner, the ALJ did not view the plaintiff's group therapy behavior in a vacuum – he also considered the plaintiff's social interactions outside of group therapy, her daily

activities, and her ability to attend vocational training on a full-time basis (Tr. 17-18).  The plaintiff fails to cite any authority indicating that reference to her improvement through group therapy, when viewed in conjunction with the rest of the medical record, was improper.

The plaintiff further argues that the ALJ improperly considered her activities of daily living (doc. 12 at 33).  The plaintiff cites to a case that found that evidence of a claimant occasionally exercising and going to church did not constitute good cause for rejecting the opinion of her treating psychiatrist (*id.* (citing *Barnes v. Comm'r of Soc. Sec.*, C.A. No. 6:14-762-Orl-DNF, 2015 WL 5600318, at *7 (M.D. Fla. Sept. 22, 2015)).  Here, the ALJ's consideration of the plaintiff's activities of daily living was just one factor in the overall credibility analysis that included her treatment records, medical opinion evidence, and treatment improvement. Here, the ALJ considered, among other things, that the plaintiff was able to attend full-time (5 days, 40 hours per week) vocational training in which she performed work while in a social setting with other employees and supervisors and her occasional socializing with friends (Tr. 17-18).  The plaintiff has failed to show any error in the ALJ's consideration of her activities of daily living as part of the credibility analysis.

The plaintiff also argues (doc. 12 at 32-33) that the ALJ engaged in "sit and squirm jurisprudence" when he noted that the plaintiff "presented herself at the hearing with a flat effect, but demonstrated engaging behavior and good recall" (Tr. 17).   While an "ALJ may not *solely* base a credibility determination on his observations at a hearing [,]. . . the ALJ may include these observations in his credibility determination."  *Massey v. Astrue*, C.A. No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) (citing *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir.1990) (stating that based a credibility determination based solely upon hearing observations is improper); *but see Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (stating that observations at a hearing may be used in part in making a credibility determination)); SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints

solely on the basis of such personal observations).[4] Here, the ALJ considered several factors in making the credibility determination as set forth above, and his single reference to the plaintiff's behavior and recall at the hearing as part of a larger analysis of her overall credibility was not in error.

Based upon the foregoing, the undersigned recommends that the district court find that the ALJ's credibility assessment was based upon substantial evidence and without legal error.

### Treating Psychiatrist

Lastly, the plaintiff argues that the ALJ failed to properly consider the opinion of her treating psychiatrist, Dr. Forsthoefel (doc. 12 at 34-38). The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(c)(2);

---

[4]As noted above, SSR 96-7p has been superseded by SSR 16-3p, but the ALJ issued his decision prior to the effective date of SSR 16-3p. In any event, SSR 16-3p provides that an ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."2016 WL 1119029, at *7. The ALJ complied with this ruling.

*Mastro v. Apfel*, 270 F.3d 171, 178 (4ᵗʰ Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As more fully set forth above, Dr. Forsthoefel stated several times that the plaintiff was disabled from all work.  Specifically, on October 10, 2011, Dr. Forsthoefel stated the plaintiff "remains withdrawn with no energy, interest, and unable to perform activities of daily activities . . . I believe that she qualifies for disability" (Tr. 270-71); on July 27, 2012, he indicated that the plaintiff "[r]emains with an axis 2 dependency, immaturity for years.  Remains disabled from all work" (Tr. 285-86); on October 1, 2012, Dr. Forsthoefel stated that "[d]espite marginal improvement [she] remains totally disabled from all work"  (Tr. 283-84); on March 20, 2013, Dr. Forsthoefel stated that the plaintiff "remains disabled from all work" (Tr. 298-99); on April 17, 2013, Dr. Forsthoefel provided a statement indicating that the plaintiff was "not a functioning person," her concentration and memory were impaired, she was easily distracted and seemed to be responding to internal stimuli, and "[s]he would not be able to interact with supervisors and coworkers appropriately because she is so withdrawn.  She would not be able to follow even simple instructions due to her high level of distraction and lack of concentration" (Tr. 288); and, on May 12, 2014, Dr. Forsthoefel stated that the plaintiff remained "stress intolerant and disabled from all work" (Tr. 395-96).

37

The ALJ acknowledged Dr. Forsthoefel's multiple statements in treatment notes regarding the plaintiff's inability to work and the April 2013 letter in which he gave his opinion as to the plaintiff's functional limitations (Tr. 18-19).  The ALJ found that Dr. Forsthoefel's opinion was entitled to limited weight.  Specifically, the ALJ noted that Dr. Forsthoefel's statements that the plaintiff was disabled from all work were on an issue reserved to the Commissioner (Tr. 19). *See* SSR 96-5p, 1996 WL 374183, at *5 (opinions from medical sources stating that an individual is "disabled" or "unable to work" are administrative findings reserved for the Commissioner's determination and, while they must not be disregarded, they can never be entitled to controlling weight or given special significance).  Further, the ALJ found that Dr. Forsthoefel's opinion was not supported by the record as a whole.  Specifically, just one day before Dr. Forsthoefel's April 2013 letter, the plaintiff's therapist noted that the plaintiff was "much more sociable" and "talks on a regular basis and offers suggestions and is a very healthy member of our group" (Tr. 19 (citing Tr. 295)).  In addition, while Dr. Forsthoefel stated the plaintiff was easily distracted and responded to internal stimuli, an evaluation during her vocational rehabilitation noted that she "spontaneously returned to task without prompting during interruptions," she learned tasks quickly, she followed instructions well, and she performed work at an adequate rate and quality (Tr. 19 (citing Tr. 379-80)). The ALJ further noted that during the consultative examination by Dr. Loring the plaintiff did not evidence any concentration problems, she put forth a good effort on testing, and she did not appear to be distracted or impulsive (Tr. 19 (citing Tr. 273-76)).

The plaintiff argues that the ALJ erred in relying on cherry-picked evidence and in failing to consider the intermittent nature of her condition (doc. 12 at 37-38).  The undersigned disagrees.  The ALJ considered treatment notes showing positive results from therapy and medication, and the ALJ also cited to and relied on examining and reviewing physicians - Drs. Loring, Hamrick, and Horn -  who were aware of the plaintiff's diagnosis

38

and treatment and yet found that she was capable of a range of medium work (Tr. 19). As noted by the Commissioner, Drs. Hamrick and Horn considered the plaintiff's longitudinal medical record and cited numerous treatment notes over a lengthy period that they considered in rendering their opinions (Tr. 74-76, 88-90). The undersigned finds that the ALJ properly considered and weighed Dr. Forsthoefel's opinion, and the decision to afford the opinion limited weight is supported by substantial evidence in the record.

## CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

March 13, 2017
Greenville, South Carolina

39